UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\*\*\*

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br>vs.<br><br>KENNETH EARL BROOKS,<br><br>              Defendant. | Case No. 2:16–cr–193–KJD–VCF<br><br>**REPORT & RECOMMENDATION** |

Before the court are Brooks's motion to suppress (ECF No. 22), the Government's response (ECF No. 32), and Brooks's reply (ECF No. 35). This court also considered the Government's supplement (ECF No. 47) and Brooks's response (ECF No. 49). An evidentiary hearing was held at 10:00 a.m. on November 10, 2016. For the reasons stated below, Brooks's motion should be denied.

**I. Background**

The following statement of facts is constructed from recordings of the 911 calls and of Naranjo's second interview, and the testimony of Las Vegas Metropolitan Police Officers Lopez and Zambrano, and Detectives Schallipp and Edwards.

A. The 911 Calls

On May 26, 2016, at approximately 1:00 a.m., a woman called the Las Vegas Metropolitan Police Department (Metro) to report gunshots. (ECF No. 23) The woman reported hearing two shots fired inside her apartment complex and a woman's scream. (*Id.*) The woman told the dispatcher she

lived at 3700 East Bonanza Road. (*Id.*) Despite the recent commotion, the woman said that her apartment complex was quiet. (ECF No. 23)[1]

A short time later, victim Rudolfo Naranjo called Metro. (*Id.*) He stated that an individual had shot at him near 3700 East Bonanza Road. (*Id.*) He described the individual as an African-American male in his early 20s, wearing a white tank top. (*Id.*) Naranjo could not identify: (1) the assailant's height; (2) the color of his assailant's pants; or (3) the type of handgun that he used. (*Id.*) Naranjo told the dispatcher that we would be able to lead officers to his assailant's apartment. (*Id.*) Naranjo claimed the shooting was preceded by a verbal altercation.

Brooks allegedly challenged Naranjo by shouting, "which way are you looking at?" Narajano responded, "I can look anyway I want. I live here." (*Id.*) Brooks then allegedly said, "well, I live here" and gestured in the direction of apartment #1118. Brooks then went into his apartment, retrieved a handgun, and shot at Naranjo twice. (*Id.*) Naranjo ran to a nearby supermarket and called police. (*Id.*) He also reported a black sedan leaving the apartment complex. (*Id.*) Naranjo's wife, who remained inside their apartment, believed that the sedan was involved with the shooting. (*Id.*) Shortly thereafter Metro officers arrived and met Naranjo in the supermarket parking lot.

### B. Metro Officer's Speak with Cherry Morton

Officer Lopez canvassed the area of the shooting. At some point early in the investigation, Officer Lopez or another officer located a single spent shell casing near apartment #1118. A second shell casing was never found. Naranjo directed him to apartment #1118, where he conducted a "knock and talk." (*Id.*) Another officer conducted a "knock and talk" at the adjacent apartment. An African-American female, Cherry Morton, answered the door of apartment #1118. (*Id.*) Morton told Officer

---

[1] Docket number 23 contains two CDs. One CD, identified as Defense Exhibit "B", is an audio recording of the 911 calls received by Metro regarding this incident.

Lopez that her grandson, Kenneth Brooks, was at her apartment earlier, but was not home. Morton was initially cooperative, but became uncooperative when asked about Brooks. She refused to answer any questions and refused to allow officers inside. (*Id.*) She ended the encounter by slamming the door closed.

Sometime after the first "knock and talk," Detectives Schallipp and Edwards arrived at the scene. Detective Schallipp interviewed Naranjo inside his apartment. This interview was not recorded. According to the detective, Naranjo reiterated the information provided in his 911 call. Specifically, he repeated his description of the assailant: African-American male in his early 20s, approximately 5'10" tall, wearing a white tank top and shorts.

Later that night, officers again attempted to speak with Morton. (*Id.*) Detective Edwards conducted the second "knock and talk;" Detective Schallipp stood immediately behind him and to the right. Officer Lopez stood to Detective Edwards's left and was not visible to the occupants of the apartment. Officer Zambramo stood approximately 10 feet behind the three officers, close to where the shell casing had been discovered.

Detective Edwards first asked Morton if she saw or heard anything related to the shooting. She said she had not. He then asked her if there was anyone else in her apartment. She said she was alone in the apartment. Detective Edwards then asked if anyone else lived with her. She said her grandson, Kenneth Brooks, lived with her, that he had been by earlier that day, but was not home. The detective then asked if he could step inside and look for Brooks. Morton told him he could not. Morton then excused herself to make a phone call.

At this time, Brooks appeared out of a back bedroom and asked what was going on. Detective Edwards gave Brooks the following commands: (1) take your hands out of your pockets; (2) raise your hands and keep them where I can see them; and (3) come out of the apartment. While he was giving

these commands, Detective Edwards had his hand on his gun.  Detective Schallipp and Officer Lopez had removed their guns from their holsters and held them by their sides.

Brooks complied with these commands and was immediately placed in handcuffs.  The officer did not ask him any questions.  Instead Brooks remained handcuffed for approximately 15 minutes, while Officer Lopez set up a show-up identification.  At the show-up, Naranjo identified Brooks as his assailant.  Brooks was immediately arrested on suspicion of assault with a deadly weapon.

### C. Naranjo's Interview

After the show-up, Detective Schallipp conducted a second interview with Naranjo.  (ECF No. 23)[2]  The interview was conducted at approximately 3:17 a.m. inside Naranjo's apartment.  (*Id.*)  This interview was recorded.  In the interview, Naranjo provided additional details about the incident.  (*Id.*)  He claimed that Brooks shouted "I'll kill you" as he was shooting at him.  (*Id.*)  Naranjo's wife had also told him that she believed that Brooks had given the handgun to the driver of the black sedan before returning to his apartment.  (*Id.*)  At the detective's prompting, Naranjo stated that, during the initial confrontation, Brooks told Naranjo that he lived in apartment #1118.  (*Id.*)  The detective confirmed that the apartment Brooks had identified was the only ground level apartment that had two chairs beside the front door.  (*Id.*)

The detective then reviewed the prior show-up identification with Naranjo.  (*Id.*)  Naranjo said, "that's definitely him," when officers presented Naranjo with Brooks shortly after the latter's arrest.  (*Id.*)  Naranjo had only been "80%" sure that Brooks was his assailant until officers shined a light on Brooks's face.  (*Id.*)  Thereafter Naranjo was "100%" Brooks had shot at him.  (*Id.*)  Naranjo also

---

[2] Docket number 23's second CD, identified as Defense Exhibit E, is a recording of Detective Schallipp's interview with Naranjo.

commented that he recognized the color of Brooks's shorts. (*Id.*) He also said that Brooks may have been using a black revolver. (*Id.*)

### D. Brooks's Phone Calls

While at the Clark County Detention Center, Brooks made a phone call to an unidentified woman. (ECF No. 32) The call was recorded, and Brooks was advised accordingly. (*Id.*) He purportedly confessed to the shooting and attempted to arrange alibi witness testimony. (*Id.*) Metro officers transferred the recording on to a CD, which was disclosed as part of pretrial discovery.

## II. Discussion

1. Brooks's Initial Seizure Was an Arrest That Necessitated Probable Cause

"An arrest—or, to use the Fourth Amendment's terminology, a 'seizure' —occurs when a law enforcement officer, through coercion, physical force, or a show of authority, in some way restricts the liberty of a person." *Hopkins v. Bonvicino*, 573 F.3d 752, 773 (9th Cir. 2009). "[W]hether an individual is in custody depends upon the objective circumstances of the situation, or whether a reasonable innocent person in such circumstances would conclude that after *brief questioning he or she would not be free to leave*." *United States v. Bravo*, 295 F.3d 1002, 1009 (9th Cir. 2002)(emphasis in original).

The Government argues that, although Brooks was handcuffed, Metro officers did not initially need probable cause to detain Brooks. Rather Brooks's initial detention was a *Terry* stop, which only required reasonable suspicion. "Under ordinary circumstances, drawing weapons and using handcuffs are not part of a *Terry* stop. *United States v. Miles*, 247 F.3 1009, 1012 (9th Cir. 2001). "Nevertheless, we allow intrusive and aggressive police conduct without deeming it an arrest … when it is a reasonable response to legitimate safety concerns on the part of the investigating officers." *Id.*(internal quotations omitted).

Here, a reasonable, innocent person in Brooks's position would have believed that he would be subject to more than a brief questioning. From his vantage point, Brooks saw a plainclothes Metro detective (Detective Edwards) with his hand of his gun and possibly a second plainclothes Metro detective (Detective Schallipp) with his weapon drawn and held to his side. Shortly after being confronted with this sight, Detective Edwards instructed Brooks to: (1) take his hands out of his pockets; (2) raise his hands; (3) keep his hands in the air; (4) not reach for anything; and (5) come out of the apartment. Once he stepped outside, Metro officers placed Brooks in handcuffs. Officer did not ask him any questions, and approximately 15 minutes later, Brooks was presented to Naranjo for a show-up identification.

The Government argues that the officers had legitimately safety concerns that necessitated the officers' actions. (ECF No. 32) A shooting had occurred in the apartment, and the victim indicated that the suspect was an African American male, who lived in apartment #1118. However, the shooting had occurred approximately 2 hours before officers encountered Brooks. The scene remained quiet during the officers' investigation, and Brooks appeared without his shirt and in an apparent state of bewilderment.[3] Any danger present at the time of the shooting, had dissipated by the time officers encountered Brooks. *See United States v. Gooch*, 6 F.3d 673, 679 (9th Cir. 1993). Given the disproportionate show of force used to compel Brooks to leave the apartment, this court concludes that Brooks's detention amounted to an arrest. *United States v. Del Vizo*, 918 F.2d 821, 825 (9th Cir. 1990).

2.  Metro Officer's Had Probable Cause to Arrest Brooks

Since Brooks's initial seizure was a formal arrest, the officers needed probable cause.

---

[3] Detective Edwards testified that Brooks had asked, "what's going on?" upon leaving the rear bedroom.

"Under the Fourth Amendment, a warrantless arrest requires probable cause." *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007).  Probable cause exists when "under the totality of circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the defendant] had committed a crime." *United States v. Smith*, 790 F.2d 789, 792 (9th Cir. 1986).  Alternatively, probable cause exists when "officer have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." *Lopez*, 482 F.2d at 1072.

"Probable cause demands factual specificity and must be judged according to an objective standard, taking into account the nature and trustworthiness of the evidence of criminal conduct available to the police." *United States v. Struckman*, 603 F.3d 731, 743 (9th Cir. 2010).

"[I]n seeking to establish probable cause, officers may not solely rely on the claim of a citizen witness …, but must independently investigate the basis of the witness' knowledge or interview other witnesses." *Id.*  "[M]ere resemblance to a general description is not enough to establish probable cause." *Grant v. City of Long Beach*, 315 F.3d 1081, 1088 (9th Cir. 2002); *see also United States v. Ricardo D.*, 912 F.2d 337, 342 (9th Cir. 1990)(finding that suspect's resemblance to generic descriptions such as "young, thin man, not too tall" and "young, Mexican male" was insufficient to establish probable cause).  "However, it is permissible to consider a general physical description where it is found in combination with other particularized bases for suspicion." *Lopez*, 482 F.3d at 1074.

"It is well established that a person's mere presence or 'mere propinquity to … criminal activity does not, without more, give rise to probable cause.'" *Id.* (quoting *Ybarra v. Illinois*, 444 U.S. 85, 91, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979)).

The Government contends that there are enough facts to establish probable cause.  This court agrees.  Two 911 callers reported a two shots fired at the apartment complex, Naranjo provided a

description of Brooks[4] and directed them towards Brooks's apartment, a shell casing was found outside of Brooks's apartment[5], and Morton told officers that Brooks did live with her, but was not at home. (

Contrary to Brooks's claim, that Metro officers arrested the first African-American male they found, the officers had ample reason to suspect Brooks as involved in the shooting. Not only did Brooks match Naranjo's admittedly vague description of the assailant, but he was also found in the apartment Naranjo identified. These facts coupled with Morton's reluctance to discuss her grandson's whereabouts, gave officers probable cause to arrest Brooks for the shooting,

2.  The Warrantless Entry into Morton's Apartment was Unjustified

Even if Metro officer had probable cause to arrest Brooks, the Government concedes that there was no exigent circumstance that would have allowed Metro officers to enter Morton's apartment.

"It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980). "The Fourth Amendment prohibits police officer from making a warrantless entry into a person's home, unless the officers have probable cause and are presented with exigent circumstances." *LaLonde v. County of Riverside*, 204 F.3d 947, 954 (9th Cir. 2000)(emphasis in original). "[N]o amount of probable cause can justify a warrantless arrest or entry absent an exception to the warrant requirement." *Struckman*, 603 F.3d at 743.

---

[4] Brooks argues that Naranjo's information should be given little weight. Brooks alleges that Naranjo is an unreliable witness; he had lied about being a military police officer and likely lied about being a forensic pathologist. The fact that Naranjo is a liar does not preclude him from being the victim of a crime. A police officer is entitled to rely on his training and experience to determine the trustworthiness of a witness's statements. *See Ewing v. City of Stockton*, 588 F.3d 1218, 1230 (9th Cir. 2009). Each officer who interacted with Naranjo found him trustworthy, either because they did not know about his alleged lies or determined that the lies did not detract from his claims regarding the shooting. This court credits the officers determination and find they properly relied on Naranjo's statements.

[5] This court gives little weight to the shell casing. If two shots had been fired, Metro officers should have discovered two shell casings within close proximity to one another. Additionally, Naranjo later identified his assailant's weapon as a revolver, a type of handgun that does not eject spent shell casings.

The Ninth Circuit has defined four categories of exigent circumstances: "(1) the need to prevent physical harm to the officers or other persons, (2) the need to prevent the imminent destruction of relevant evidence, (3) the hot pursuit of a fleeing suspect, and (4) the need to prevent the escape of a suspect." *Id.*

"The government bears the burden of showing specific articulable facts to justify the finding of exigent circumstances." *Id.*

Although Metro officers took Brooks into custody outside of the apartment, they did so only after a Metro detective placed his hand on his gun, ordered Brooks to keep his hands up, and commanded him to exit the apartment. This coercion rendered Brooks's exit from the apartment involuntary. *See United States v. Al-Azzawy*, 784 F.2d 890, 893 (9th Cir. 1985)(finding the defendant had been effectively arrested in his home when law enforcement officers surrounded his home with weapons drawn, and commanded him to come out over a bullhorn).

Having found a warrantless arrest in the home, this court would ordinarily move onto the second prong of *Payton*: whether an exigent circumstance existed to justify the warrantless home arrest. However, at the evidentiary hearing, the Government conceded that no exigency existed. This court thus finds that Brooks's warrantless, in-home arrest constituted a *Payton* violation.

3.     The Show-Up Identification and Jail Phone Calls Are Not Fruits of the Poisonous Tree

*New York v. Harris*, 495 U.S. 14, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990), "established the scope of the exclusionary rule's application following a *Payton* violation. *United States v. Nora*, 765 F.3d 1049, 1055 (9th Cir. 2014).

In *Harris*, the Supreme Court held that "where the police have probable cause to arrest a suspect, the exclusionary rules does not bar the State's use of a statement made by the defendant outside of his home, even though the statement is taken after an arrest made in the home in violation of *Payton*." 495

U.S. at 21. The *Payton* rule is designed to protect "the privacy and sanctity of the home." *Id.* Evidence should only be suppressed if it "is in some sense the product of illegal governmental activity." Id. at 19. "In the context of a *Payton* violation, the illegality doesn't consist of gaining custody of the defendant; the existence of probable cause to arrest provides a lawful basis for that intrusion upon the defendant's liberty." *Nora*, 765 F.3d at 1056. "Instead, the illegality consists of the officers' intrusion into the privacy and sanctity of the home without prior judicial authorization." *Id.*

With this rationale in mind, neither the show-up identification nor the jail phone call should be suppressed as a result of the *Payton* violation. It does not appear that any evidence was recovered from inside the apartment. The handgun was never found, and the only piece physical evidence, the shell casing, was found outside of the apartment.

The show-up identification and phone call were not a result of the Metro officers' intrusion into the apartment. Rather they were a product of Brooks's being taken into custody. *Id.* ("Only evidence that the police discover as a result of having made the arrest in the home rather than someplace else can be deemed the product of a *Payton* violation.") Put another way, Metro officers would have still obtained the show-up identification and phone calls if they had waited for Brooks to leave the apartment, ensured he was in a public place, then immediately arrested him. *See Harris*, 495 U.S. at 21. Under *Harris*, even though Metro officers committed a *Payton* violation, the subsequent show-up identification and phone call should not be suppressed.

4.  The Show-Up Identification Was Not Impermissibly Suggestive

"To determine whether an identification procedure violates a defendant's due process rights, a court must consider 'whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive.'" *United States v. Drake*, 543 F.3d 1080, 1088 (9th Cir. 2008)(quoting *Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972)). A

court must consider the "opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Id.* (internal quotations omitted).

"While it is the better practice not to refer to the subject of a show-up as a 'suspect' in view of the danger of adverse inferences being drawn by a witness, the reference by itself is not an impermissible suggestion." *United States v. Kessler*, 692 F.2d 584, 586 (9th Cir. 1982) "The use of handcuffs or other indicia of custody will not invalidate a show-up, at least where necessary for the prompt and orderly presentation of the suspect, consistent with protection of the officers and witnesses." *Id.*

Brooks argues that the show-up identification was impermissibly suggestive. This court disagrees. The identification occurred within hours of the shooting, Brooks matched Naranjo's description of his assailant, and Naranjo was very confident[6] that Brooks was his assailant. *See Drake*, 543 F.3d at 1088. Although Brooks was in handcuffs and presented to Naranjo in isolation, Naranjo was cautioned, verbally and in writing,[7] that Brooks may not be the shooter. *See id.* The application of the *Drake* factors demonstrates that show-up identification was not impermissibly suggestive.

ACCORDINGLY, and for good cause shown,

/// /// ///

/// /// ///

/// /// ///

---

[6] At the show-up, Naranjo was initially "80%" sure that Brooks was his assailant. This was revised to "100%" after officers shined a light on Brooks's face.

[7] At the evidentiary hearing, Officer Lopez testified that he read Naranjo an advisement that stated, in part, that Brooks may not be a suspect. Naranjo also signed a written form informing him of the same. (Government's Exhibit 5).

IT IS HEREBY RECOMMENDED that Brooks's motion to suppress (ECF No. 22) be DENIED.

IT IS SO RECOMMENDED.

DATED this 17th day of November, 2016.

                                                                      CAM FERENBACH
                                                                       UNITED STATES MAGISTRATE JUDGE