# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Case No. 2:16-CR-00193-KJD-VCF |
| v. | **ORDER** |
| KENNETH BROOKS | |
| Defendant. | |

Presently before the Court for consideration is the Report and Recommendation (#51) of Magistrate Judge V. Cam Ferenbach, entered on November 17, 2016 recommending that Defendant's Motion to Suppress (#22) be denied.  Defendant filed an objection (#55) on November 21, 2016 to which the Government replied in partial opposition (#56) on November 22, 2016.

**I. Background**

The Court adopts the Magistrate's statement of facts except as otherwise noted.

A. The 911 Calls

On May 26, 2016, at approximately 1:00 a.m., a woman called the Las Vegas Metropolitan Police Department (Metro) to report gunshots. (#23) The woman reported hearing two shots fired inside her apartment complex and a woman's scream. Id. The woman told the dispatcher she lived at 3700 East Bonanza Road. Id.

A short time later, victim Rudolfo Naranjo called Metro. Id. He stated that an individual had shot at him near 3700 East Bonanza Road. Id. He described the individual as an African-American male in his early 20s, wearing a white tank top. Id. Naranjo could not identify: (1) the assailant's height; (2) the color of his assailant's pants; or (3) the type of handgun that he used. Id. Naranjo told

1  the dispatcher that he would be able to lead officers to his assailant's apartment. Id. Naranjo claimed

2  the shooting was preceded by a verbal altercation.

3      Brooks allegedly challenged Naranjo by shouting, "which way are you looking at?" Narajano

4  responded, "I can look anyway I want. I live here." Id. Brooks then allegedly said, "well, I live here"

5  and gestured in the direction of apartment #1118. Brooks then went into his apartment, retrieved a

6  handgun, and shot at Naranjo twice. Id. Naranjo ran to a nearby supermarket and called police. Id.

7  He also reported a black sedan leaving the apartment complex. Id. Naranjo's wife, who remained

8  inside their apartment, believed that the sedan was involved with the shooting. Id.  Shortly thereafter

9  Metro officers arrived and met Naranjo in the supermarket parking lot.

10      B. Metro Officer's Speak with Cherry Morton

11      Officer Lopez canvassed the area of the shooting.  At some point early in the investigation,

12  Officer Lopez or another officer located a single spent shell casing near apartment #1118. A second

13  shell casing was never found. Naranjo directed him to apartment #1118, where he conducted a

14  "knock and talk." Id.  Another officer conducted a "knock and talk" at the adjacent apartment. An

15  African-American female, Cherry Morton, answered the door of apartment #1118. Id.  Morton told

16  Officer Lopez that her grandson, Kenneth Brooks, was at her apartment earlier, but was not home.

17  Morton was initially cooperative, but became uncooperative when asked about Brooks. She refused

18  to answer any questions and refused to allow officers inside. Id.  She ended the encounter by

19  slamming the door closed.

20      Sometime after the first "knock and talk," Detectives Schallipp and Edwards arrived at the

21  scene.  Detective Schallipp interviewed Naranjo inside his apartment. This interview was not

22  recorded. According to the detective, Naranjo reiterated the information provided in his 911 call, and

23  included the suspect's height and that he was wearing shorts.

24      Later that night, officers again attempted to speak with Morton. Id. Detective Edwards

25  conducted the second "knock and talk;" Detective Schallipp stood immediately behind him and to

26  the right. Officer Lopez stood to Detective Edwards's left and was not visible to the occupants of the

apartment. Officer Zambramo stood approximately 10 feet behind the three officers, close to where the shell casing had been discovered. Detective Edwards first asked Morton if she saw or heard anything related to the shooting. She said she had not. He then asked her if there was anyone else in her apartment. She said she was alone in the apartment. Detective Edwards then asked if anyone else lived with her. She said her grandson, Kenneth Brooks, lived with her, that he had been by earlier that day, but was not home. The detective then asked if he could step inside and look for Brooks. Morton told him he could not. Morton then excused herself to make a phone call.

At this time, Brooks appeared out of a back bedroom and asked what was going on. Detective Edwards gave Brooks the following commands: (1) take your hands out of your pockets; (2) raise your hands and keep them where I can see them; and (3) come out of the apartment. While he was giving these commands, Detective Edwards had his hand on his gun. Detective Schallipp and Officer Lopez had removed their guns from their holsters and held them by their sides.

Brooks complied with these commands and was immediately placed in handcuffs. The officer did not ask him any questions. Instead Brooks remained handcuffed for approximately 15 minutes, while Officer Lopez set up a show-up identification. At the show-up, Naranjo identified Brooks as his assailant. Brooks was immediately arrested on suspicion of assault with a deadly weapon.

C. Naranjo's Interview

After the show-up, Detective Schallipp conducted a second interview with Naranjo. (#23). The interview was conducted at approximately 3:17 a.m. inside Naranjo's apartment. Id. This interview was recorded. In the interview, Naranjo provided additional details about the incident. Id. He claimed that Brooks shouted "I'll kill you" as he was shooting at him. Id. Naranjo's wife had also told him that she believed that Brooks had given the handgun to the driver of the black sedan before returning to his apartment. Id. At the detective's prompting, Naranjo stated that, during the initial confrontation, Brooks told Naranjo that he lived in apartment #1118. Id. The detective confirmed that the apartment Brooks had identified was the only ground level apartment that had two chairs beside the front door. Id.

The detective then reviewed the prior show-up identification with Naranjo. Id. Naranjo said, "that's definitely him," when officers presented Naranjo with Brooks shortly after the latter's arrest. Id. Naranjo had only been "80%" sure that Brooks was his assailant until officers shined a light on Brooks's face. Id. Thereafter, Naranjo was "100%" sure Brooks had shot at him. Id. Naranjo also commented that he recognized the color of Brooks's shorts. Id. He also said that Brooks may have been using a black revolver. Id.

### D. Brooks's Phone Calls

While at the Clark County Detention Center, Brooks made a phone call to an unidentified woman. (#32). The call was recorded, and Brooks was advised accordingly. Id. He purportedly confessed to the shooting and attempted to arrange alibi witness testimony. Id. Metro officers transferred the recording on to a CD, which was disclosed as part of pretrial discovery.

## II. Discussion

The Court has conducted a *de novo* review of the record in this case in accordance with 28 U.S.C. § 636(b)(1) and LR IB 3-2.

Defendant's Objections to the Magistrate's Report and Recommendation raise no new legal issues. Rather, Defendant requests this Court to reject the Magistrate Judge's factual and legal analysis with regards to the legitimacy of the Defendant's seizure and whether or not the subsequent show-up identification and jail call admissions are the fruit of the poisonous tree. In an effort to illustrate that the Report and Recommendation incorrectly determined that there was probable cause to arrest Defendant, Defendant's Objections allege that "[t]he R&R misstates the description of the shooter that police had at the time they arrested Mr. Brooks." (#55 at 2). This is because, according to Defendant, the Magistrate's Report and Recommendation incorrectly added that the victim of the shooting at issue in this case provided the shooting suspect's height and what he was wearing before the police made contact with Defendant. Id.

The Government agrees that the Magistrate's Report and Recommendation incorrectly indicate that the victim *repeated* the suspect's height and that the suspect was wearing shorts. (#56)

1    (Emphasis in original). The 911 call admitted as an exhibit, combined with Detective Schallipp's and

2    Detective Edwards' testimony adduced at the evidentiary hearing, established that the victim did not

3    initially provide the suspect's height or the fact that he was wearing shorts during the 911 call, but he

4    *did* provide that information when Detective Schallipp subsequently interviewed the victim inside of

5    his apartment *prior* to the police making contact with Defendant. Id. Consequently, before the police

6    actually made contact with Defendant, they were in possession of a specific description of the

7    assailant and Defendant matched that description. Thus, 1) the description of the assailant provided

8    by the victim (to include height, race, approximate age, sex, clothing, and residence); 2) the fact that

9    when the police went to the residence where the victim indicated the assailant lived, the Defendant's

10   grandmother (Cherry Morton) indicated that the only person who lived in the residence with her was

11   her (black male) grandson Kenneth Brooks; 3) the fact that Cherry Morton had also stated that her

12   grandson was present in the apartment earlier in the day; 4) the fact that when the police saw the

13   Defendant inside of the residence (after Cherry Morton had lied and said she was home alone), they

14   verified that he was in fact Kenneth Brooks; and 5) the discovery of an expended shell casing in front

15   of the residence all—under the totality of the circumstances—provided probable cause to arrest the

16   Defendant.  Thus, the Defendant was not arrested, as the Defendant's Objections claim, simply

17   because he bore "mere resemblance to a general description." The Court therefore finds, probable

18   cause existed for Defendant's arrest.

19        The Defendant's Objections also take issue with the fact that the police report completed by

20   Detective Edwards in connection with this case stated that the victim gave a taped interview where

21   he provided the necessary details before the Defendant was arrested and "[n]o such recording exists.

22   The only recording of Mr. Naranjo stating the suspect's height and shorts is the taped interview

23   conducted *after* [the Defendant had been detained]." (#55 at 3) (emphasis in original). The testimony

24   adduced at the hearing, however, corroborated that the victim actually provided a sufficient

25   description of the assailant before the taped statement was obtained. The Defendant's Objections go

26   on to state that "[t]he R&R fails to make necessary credibility findings as to those two detectives."

Id. at 3-4. Inherent in the Magistrate's Report and Recommendation, however, is a credibility determination crediting the detectives' testimony that the victim provided the relevant information prior to the Defendant's initial seizure. The Report and Recommendation specifically states that "[t]his court credits the officers [sic] determination and find [sic] they properly relied on Naranjo's statements." (#51 at 8, n.4).

The Defendant's assertion that "[w]hen Detective Edwards saw Mr. Brooks in the apartment, he had no idea if Mr. Brooks was the grandson, a roommate, a visitor, or subletter of Ms. Morton" (#55 at 6) fails because Cherry Morton had indicated that the *only* person who resided in the apartment with her was her grandson Kenneth Brooks (as opposed to a roommate or subtenant), and the Magistrate recalls the testimony of either Detective Schallipp or Detective Edwards establishing that they verified the person in the apartment was Kenneth Brooks before he was asked to step outside.

The government preserves the argument that Brooks' initial detention was a *Terry* stop necessitating only reasonable suspicion, not probable cause, to detain Defendant long enough to conduct an investigation and verify whether or not he was the shooter. The Magistrate reached the conclusion that Defendant was in fact arrested when he was ordered to step out of the apartment he shared with his grandmother. According to the Magistrate, a reasonable, innocent person in Brooks's position would have believed that he would be subject to more than a brief questioning. From his vantage point, according to the Magistrate, Brooks saw a plainclothes Metro detective (Detective Edwards) with his hand on his gun and possibly a second plainclothes Metro detective (Detective Schallipp) with his weapon drawn and held to his side. Shortly after being confronted with this sight, Detective Edwards instructed Brooks to: 1) take his hands out of his pockets; 2) raise his hands; 3) keep his hands in the air; 4) not reach for anything; and 5) come out of the apartment.

Once he stepped outside, Metro officers placed Brooks in handcuffs.  Officer did not ask him any questions, and approximately 15 minutes later, Brooks was presented to Naranjo for a show-up.

The Government argues that the officers had legitimate safety concerns giving rise to exigent circumstances that necessitated the officers' actions (warrantless entry and seizure of Defendant) (#32). A shooting had occurred in the apartment complex, and the victim indicated that the suspect was an African American male, who lived in apartment #1118.  The Report and Recommendation states, however, that because the shooting had occurred approximately 2 hours before officers encountered Brooks; the scene remained quiet during the officers' investigation; and Brooks appeared without his shirt and in an apparent state of bewilderment; any danger present at the time of the shooting, had dissipated by the time officers encountered Brooks. See United States v. Gooch, 6 F.3d 673, 679 (9th Cir. 1993). To support this assertion, the Magistrate points to United States v. Gooch, wherein the district court found the risk of harm to the officers and others did not exist where reports of a shooting at a campground prompted their search (several hours later) of suspect's tent and seizure of his person.  The government's argument in Gooch is similar to it's argument here: the facts that the defendant was intoxicated, that a firearm had been discharged recently, and that people were leaving the campground in fear supported the officers' conclusion that there was an immediate threat to public safety. 6 F.3d at 679.  However, according to the court in Gooch, there was no actual ongoing threat. The district court found that the campground appeared quiet when the officers arrived in the daylight hours (several hours after the alleged fight and subsequent shooting were reported).  Id.

Exigent circumstances are " 'those in which a substantial risk of harm to the persons involved or to the law enforcement process would arise if the police were to delay a search [or arrest] until a warrant could be obtained.' " Id. (citation omitted) (brackets in original). Exigent circumstances are present when "a reasonable person [would] believe that entry ... was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the

7

escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts." Id.

According to the Government, the Magistrate's conclusion that "[a]ny danger present at the time of the shooting[] had dissipated by the time officers encountered Brooks," ignores the realities of police investigations. (#51). The Government also contends that the Court's reliance on Gooch is inappropriate because this case dealt with whether or not exigent circumstances continued to exist after a shooting, not whether or not the police reasonably had safety concerns at the onset of the encounter with the suspect.  This Court finds that a reasonable officer's belief that his safety is threatened is an exigent circumstance. Thus, the inquiry of whether this exigency continued to exist two hours after the shooting occurred is ultimately instructive on whether or not the order to exit the residence where Defendant was temporarily seized was justified. Further, the resolution of the inquiry of whether the exigency continued to exist resolves whether Defendant was temporarily seized pursuant to a Terry investigation or whether Defendant's seizure amounted to a warrantless arrest in his home, giving rise to a possible Payton violation.

During the hearing on Defendant's motion to suppress, the Government conceded that no exigency existed for the warrantless arrest of Defendant in his home.  However, the government also asserts that no arrest took place to amount to a Payton violation, rather, Defendant was merely temporarily seized, giving rise to a Terry investigation.  To support their argument, the Government points to United States v. Gori wherein the court held that there was no Payton violation and the Fourth Amendment was not violated when an apartment door was voluntarily opened by one of the apartment's occupants and a police officer (who had reasonble suspicion that there were drugs inside of the apartment) temporarily seized the apartment's occupants (without a warrant) by ordering them outside in order to conduct a Terry investigation.

This Court agrees with the Government's reasoning that the seizure of Defendant from his home amounted to a Terry investigation, necessitating reasonable suspicion.  Additionally, based on

8

the aforementioned facts, this Court finds probable cause existed to ultimately arrest Defendant after he was positively identified by the victim during the show-up.  The Court, therefore determines that the Report and Recommendation (#51) of the United States Magistrate Judge entered November 17, 2016, should be adopted, in part, denied, in part only as to the characterization of the Defendant's seizure at the front door to his residence, and affirmed.  In other words, this Court finds that Defendant's seizure at the front door to his residence was a temporary detention justified by reasonable suspicion.

Accordingly, **IT IS HEREBY ORDERED** that  the Report and Recommendation (#51) of Magistrate Judge V. Cam Ferenbach, entered on November 17, 2016 is **Adopted, in part and Affirmed.**

DATED this 29th day of November 2016.

_____
Kent J. Dawson
United States District Judge

9